# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Wisconsin

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) |
| Jaheim H. ROBINSON ("ROBINSON") | ) Case No. 25-819M(NJ) |
| DOB: XX/XX/2003 | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | |

# CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  September 12, 2023 - Present Date   in the county of          Milwaukee          in the

     Eastern      District of          Wisconsin      , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1); 846; & 843 (b); and 18 U.S.C. §§ 922(o); 2(a) | Distribution and Possession with Intent to Distribute Controlled Substances; Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances; Use of Communications Facilities to Facilitate Controlled Substance Felonies; Possession of a Machinegun; and Aiding and Abetting the Aforementioned Offenses. |

This criminal complaint is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

ALEX OTOOLE
(Affiliate)

Digitally signed by ALEX OTOOLE (Affiliate)
Date: 2025.02.12 10:37:39 -06'00'

*Complainant's signature*

Alex O'Toole, DEA TFO

*Printed name and title*

Sworn via telephone; transmitted via email pursuant to Fed. R. Crim. 4.1

Date: 2/13/2025

*Judge's signature*

City and state:          Milwaukee, Wisconsin          Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Alex O'Toole, a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA) being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      Pursuant to my official duties, I am submitting this Affidavit in support of an application for a criminal complaint and arrest warrant, for violations of federal law, including violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), and 843(b) (Use of Communications Facilities to Facilitate Controlled Substance Felonies) and Title 18, United States Code, Sections 922(o) (Possession of a Machinegun) and 2(a) (Aiding and Abetting the Aforementioned Offenses).

2.      I am a Task Force Office with the DEA and have been since January 2022. Before that, I was employed as a deputy sheriff with the Waukesha County Sheriff Office (WKSO) in Waukesha, Wisconsin, where I spent the last 7 years as a Detective in our detective bureau with the focus on financial and major crimes.  During my tenure as a police officer, I have been involved in multiple drug related investigations to include but not limited to sale, distribution, and Len bias homicides.  As a member of DEA, I worked investigations directly in the City of Milwaukee and the State of Wisconsin as well as the entire United States based upon the direction of the investigations that arise through the Milwaukee District Office (MDO) of the DEA.

3.      As a federal task force enforcement officer, I have participated in the investigation of narcotic related offenses, resulting in the prosecution and conviction of

numerous individuals and the seizure of illegal drugs, weapons, stolen property, United States currency, and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacturing, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations including physical surveillance, execution of search warrants, undercover transactions, court ordered wiretaps, analysis of phone records, analysis of electronic devices, financial records informant handling and the arrest of numerous drug traffickers. I have authored many search warrants during my tenure as a law enforcement officer. I have also spoken on numerous occasions with other experienced narcotics investigators, both foreign and domestic, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses, which specialized in the investigation of drug trafficking and money laundering. Through these investigations, training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking – derived proceeds. I am aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activity.

4. Based on my training, experience, as well as information relayed to me during the course of official duties, I know that a significant percentage of controlled substances, specifically marijuana, cocaine, heroin, fentanyl and methamphetamine, imported into the United

2

States comes from Mexico and enters the domestic market at various points along the southwest borders of the United States, because Mexican cartels control the transportation, sale, and importation of marijuana, cocaine, heroin, fentanyl, and methamphetamine into the United States.

5.     Based on my training, experience, and conversations with other law enforcement officers, I know that the distributors of marijuana, cocaine, heroin, fentanyl, and methamphetamine as well as other controlled substances, often used cellular and landlines telephones.  Additionally, I know that drug traffickers often change their phone numbers and cellular devices on frequent basis in an attempt to thwart law enforcement from tracking their phones and to conceal their identity.  I know that these individuals often use code words to discuss controlled substances and methods of concealing controlled substances while talking on the telephone.  I know drug traffickers often conduct extensive counter – surveillance to avoid law enforcement detection.

6.     Based on my training and experience, I know that narcotic trafficking and money laundering organizations routinely use several operational techniques to sustain their illegal enterprises.  There practices are designed and implemented to achieve two paramount goals: First, the successful facilitation of the organization's illegal activities including the importation and distribution of controlled substances and the subsequent repatriation of the proceeds of that illegal activity; and second, the minimization of the exposure of the co-conspirators, particularly those operating in leadership roles, from investigations and prosecution by law enforcement. More specifically, based on training and experience, I know the following:

3

a. Sophisticated drug trafficking organizations routinely compartmentalize their illegal operations. The compartmentalization of the operations reduces the amount of knowledge possessed by each member of the organization. This method of operation effectively minimizes the potential damage an individual cooperating with law enforcement could inflict on the organization and further reduces the adverse impact of the particular law enforcement actions against the organization.

b. Members of these organizations routinely used communications facilities, such as cellular telephones to communicate directions and information about the organization's illegal activities to other organization members.

c. During the course of these telephonic communications, organization members routinely use coded references and encryption in an effort to elude law enforcement detection.

d. The communication of time sensitive information is critical to the successful conduct of these organizations' illegal activities. The critical nature of this information stems from the necessity of the organization's leadership to provide direction from the importation and distribution of narcotics and subsequent laundering of the proceeds of those activities.

e. Drug traffickers and money launderers associated with them often confine their illegal telephonic communications to long – trusted organizational members and high – level narcotics traffickers in an attempt to evade law enforcement and circumvent narcotics investigations;

f. Drug traffickers routinely use fictitious names or other individuals to register pagers, telephones, vehicles, real property, and utility services to avoid detections from law enforcement; and

4

g. Drug traffickers used what is refer to as a "stash house" to stow illegal items such as illegal controlled substance, packaging paraphernalia, illegal firearms, ledgers, and US currency. Oftentimes, members of drug trafficking organizations have to make stops at the stash locations to pick up illegal controlled substance to deliver. Multiple stops can be made in a day at these locations. This is done so the trafficker does not have to carry additional illegal controlled substances in their vehicle or person. This protects the trafficker from law enforcement investigations as they do not have illegal controlled substances on them after the delivery is made. Oftentimes, the US currency will be transported after the delivery to the stash house to protect against law enforcement investigation and rival drug trafficker's robbery crews.

7. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

8. Further, I am aware that vehicles are frequently used by drug and firearms traffickers to transport and store contraband. It is common for persons involved in drug trafficking to use vehicles to travel to stash locations, acquire drugs, and then use the vehicle to transport the drugs to a separate location. It is also common for drug traffickers to sell drugs

inside of a vehicle and to engage in mobile drug trafficking.

9.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), and 843(b) (Use of Communications Facilities to Facilitate Controlled Substance Felonies) and Title 18, United States Code, Sections 922(o) (Possession of a Machinegun)  and 2(a) (Aiding and Abetting the Aforementioned Offenses), have been committed, are being committed, and/or will be committed by Jaheim H. ROBINSON DOB XX/XX2003 ("ROBINSON"), and other known and unidentified subjects in the Eastern District of Wisconsin. This affidavit is submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint against ROBINSON and for an arrest warrant.

10.     The information set forth in this affidavit comes from my personal involvement in this investigation, along with information provided to me by other law enforcement officers. Throughout this affidavit, I refer to case agents.  Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom I have had regular contact regarding this investigation.

## PROBABLE CAUSE

11.     The United States, including the DEA, is conducting a criminal investigation into heroin and cocaine trafficking and illegal possession of firearms by Jaheim H. ROBINSON DOB XX/XX2003 ("ROBINSON"), and other known and unidentified subjects in the Eastern District of Wisconsin. As part of the investigation, case agents conducted controlled buys from

6

ROBINSON.

12.     Based upon my training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant (or in this case, undercover officer (UC)) purchases drugs or firearms from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant and/or UC is often wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant (or, in this case, UC) meets cases agents at a pre-determined meet location and gives the purchased drugs or firearms and the recording/monitoring equipment to the case agents. When an informant is used, the informant is again searched for contraband, weapons, and money. Additionally, the controlled substances were all weighed; tested, following the printed instructions on the field test; tested positive for the listed substance; and the target(s) were identified by the informant/UC and verified by investigators through Wisconsin Department of Transportation (DOT) photographs, booking photos, and/or social media.

### A. Controlled Buys

13.     Generally, during the below listed controlled buys of controlled substances and the previously discussed controlled buy, the Confidential Source (CS) and/or UC placed a recorded phone call and/or sent recorded text messages to the target, captured audio and video of the controlled purchase, was followed to and from the controlled purchase location, provide pre-recorded funds for the purchase of the controlled substance, debriefed after the controlled purchase, and the above evidence and statements were reviewed and verified by law enforcement.  Specific to the CS, the CS was searched before and after the controlled purchase

7

with no drugs, money, or weapons located. Additionally, the controlled substances were all weighed; tested, following the printed instructions on the field test; tested positive for the listed substance; and the target(s) were identified by the CS/UC and verified by investigators through Wisconsin Department of Transportation (DOT) photographs, booking photos, and social media.

14. Between September 12, 2023, and December 16, 2024, the UC/CS conducted at least 19 controlled buys of drugs and/or firearms from Kenneth D. SIMMONS, Jaheim H. ROBINSON, and other DTO members, some of which are detailed below. At various times, the UC would contact one of the telephone numbers operated by the DTO in order to set up the controlled buy. When one member of the DTO would be arrested and held in custody, another DTO member would begin operating the DTO phone line(s) and serving the UC/CS.

    a. **Drug Transaction with SIMMONS and ROBINSON – Telephone Number XXX-XXX-1200– September 12, 2023**

15. UC had coordinated an undercover purchase of fentanyl with the DTO drug telephone number XXX-XXX-1200, believed to be used by SIMMONS. The UC and SIMMONS agreed to for the UC to purchase 3.5 grams of fentanyl for $200.

16. On September 12, 2023, UC contacted SIMMONS at telephone XXX-XXX-1200 to coordinate the purchase of fentanyl. UC was directed to meet at the KFC located at 1402 South 43rd Street, Milwaukee, Wisconsin. Prior to the drug transaction, case agents conducting physical surveillance observed a red Alfa Romeo with Wisconsin license plate ANV6749 in the KFC lot. UC arrived at the location. UC contacted telephone number XXX-XXX-1200 and was directed to go into the Alfa Romeo. UC got into the back of the Alfa Romeo and observed SIMMONS was also sitting in the backseat of the Alfa Romeo. UC also observed a handgun in

the middle of the backseat. SIMMONS advised the gun was his and pulled it closer to him. UC gave SIMMONS $200.00 and SIMMONS handed UC the suspected fentanyl. UC then exited the Alfa Romeo and left the area. Surveillance units remained in the area and observed SIMMONS after UC left the area. Case agents observed two other unknown subjects approach the Alfa Romeo and have a short contact with the Alfa Romeo, as SIMMONS remained inside the Alfa Romeo. Based on my training, experience, and investigation in this matter, these two short contacts were consistent with likely drug transactions.

17.     UC turned over the suspected fentanyl to case agents. The substance was weighed, and field tested by case agents. The substance weighted 4.1 grams and a positive test for fentanyl. The controlled substance was sent to the DEA Crime Lab for further testing.

18.     UC provided additional details regarding the undercover controlled buy. UC stated that there were two other people in the Alfa Romeo. Case agents reviewed video of the undercover buy and were able to identify the two other individuals as Jaheim H. ROBINSON, DOB: XX/XX/2003 (driver), and Kaliyah L. SMITH DOB: XX/XX/2003 (the front passenger) based on law enforcement databases. The UC also identified ROBINSON as the other individual inside the vehicle, after reviewing a DOT photo.

19.     Case agents reviewed Wisconsin DOT records for the license plate ANV6749. The records indicated that the license plate was registered to a 2009 Black Hyundai Sonata to Myra I. Castro, DOB: XX/XX/2002. This vehicle's registration expired on April 2, 2023, and was suspended due to emissions. Based on my training and experience, those engaged in drug trafficking will often switch out license plates on vehicles used during their criminal conduct, in an attempt to evade law enforcement in identifying subjects or locations connected to the drug

9

trafficking organization.

**b. Drug Transaction with SIMMONS and ROBINSON – Telephone number XXX-XXX-1200– September 21, 2023**

20.     On September 21, 2023, UC contacted telephone number XXX-XXX-1200, believed to be used by SIMMONS, and arranged for the drug transaction to occur at 3815 North 54th Boulevard. Milwaukee, Wisconsin.  UC arrived at the location and parked in front of 3815 North 54th Boulevard. Milwaukee, Wisconsin.  Case agents observed a gray Honda Accord with Wisconsin license plate ARJ6235.  The Honda Accord pulled next to UC's undercover vehicle. Case agents observed ROBINSON was driving the Honda Accord and SIMMONS was the back passenger.  During the drug transaction, ROBINSON handed UC the suspected fentanyl and UC handed ROBINSON $750.00.   UC then left the area.   Case agents were able to follow SIMMONS and ROBINSON to a Wendy's in the area of North 6th Street and West North Avenue, in Milwaukee, Wisconsin.  Case agents lost the Honda Accord after it left Wendy's and surveillance was terminated.

21.     Following the undercover drug transaction, UC turned over the suspected fentanyl to case agents.  The controlled substance was sent to the DEA Crime Lab for testing.  The DEA Crime Lab indicated the substance weighed 12.2 grams and was fentanyl and heroin.

22.     Case agents reviewed Wisconsin DOT records for license plate ARJ6235.  The records indicated the license plate was registered to a 2020 Honda Accord to Kaliyah L. Smith DOB: XX/XX/23 with an address of 4910 North 58th Street, Milwaukee, Wisconsin.  Case agents also identified SMITH as being in the vehicle from the first buy on September 12, 2023.

**c. Drug Transaction with SIMMONS and ROBINSON – Telephone number**

10

**XXX-XXX-1200– November 1, 2023**

23.     During the investigation into the DTO, case agents became aware of a CS that could purchase controlled substances from SIMMONS.

24.     The CS advised law enforcement that the CS had a number he/she could buy into and provided the DTO telephone number XXX-XXX-1200.  The CS indicated "lil digg" was the person that used telephone number XXX-XXX-1200 and the "lil digg" would sell crack cocaine and fentanyl using telephone number XXX-XXX-1200.   Based on the investigation and following the controlled buy, case agents verified "lil digg" was SIMMONS.

25.      CS described SIMMONS as a younger black guy and stated he always has another younger black guy with him.  CS also indicated SIMMONS, and the other younger black guy used a vehicle consistent with the Alfa Romeo.   CS stated it had been a few months since CS dealt with SIMMONS.

26.     I believe that the CS is credible and that the CS's information is reliable because the CS is providing information based on CS's personal knowledge and observations.  Additionally, the CS's information has been corroborated by other sources during this investigation and supported by surveillance and call detail records.  CS is cooperating voluntarily and does not have any pending criminal charges. CS is receiving monetary payments for his/her cooperation.   CS has criminal charges for Disorderly Conduct, Issuing Worthless Checks, Forgery, Theft, Operate Vehicle Without Owner's Consent, Manufacture Deliver Cocaine, and Possession of Cocaine.

27.     Based on the CS indicating he/she could purchase crack cocaine and fentanyl from SIMMONS, members of DEA and members from City of Waukesha Police Department

11

conducted a controlled purchase of 1 gram of crack cocaine and 1 gram of fentanyl from SIMMONS and ROBINSON.

28.    Prior to November 1, 2023, at the direction of case agents, the CS coordinated a controlled purchase of 1 gram of crack cocaine and 1 gram of fentanyl from SIMMONS for $150.

29.    On November 1, 2023, CS placed a recorded phone call to telephone number XXX-XXX-1200, believed to be used by SIMMONS, to coordinate a purchase of $100 of crack cocaine and $50 of fentanyl.  SIMMONS told the CS to go to the area of North 54th Street and West Capitol Drive, Milwaukee, Wisconsin.  SIMMONS called the CS on the way to the deal from telephone number XXX-XXX-1200.  SIMMONS advised the CS to go to the alley behind 3815 North 54th Boulevard, Milwaukee, Wisconsin.

30.    CS pulled down the alley and parked one house to the north of 3815 North 54th Boulevard, Milwaukee, Wisconsin.  Case agents observed the same Alfa Romeo from the September 12, 2023, undercover drug purchase parked on the slab next to the garage of 3815 North 54th Boulevard, Milwaukee, Wisconsin.

31.    CS contacted telephone number XXX-XXX-1200, believed to be used by SIMMONS, while in the alley.  SIMMONS told the CS that he was coming out.  CS observed SIMMONS walk out of the back of the residence of 3815 North 54thBoulevard, Milwaukee, Wisconsin and walk towards the garage.  CS then pulled up behind 3815 North 54th Boulevard, Milwaukee, Wisconsin.  SIMMONS walked on the north side of the garage.  SIMMONS contacted the CS and handed the CS the suspected crack cocaine.  SIMMONS told the CS that SIMMONS just ran out of "boy" and that SIMMONS's brother was on his way to serve the CS.

12

Based on my training and experience, "boy" is a street name used by drug traffickers for fentanyl.

32.     CS handed SIMMONS $100 for the crack cocaine. CS then moved out of the alley and parked onto Vienna Street between North 54th Boulevard and North 55th Street. SIMMONS went back into 3815 North 54th Boulevard, Milwaukee, Wisconsin. Approximately five minutes later the CS contacted SIMMONS using telephone number XXX-XXX-1200 to determine SIMMONS brother's location. SIMMONS was speaking with CS using telephone number XXX-XXX-1200 and appeared to use a second telephone to contact his "brother" to determine his "brother's" location. A little while later, a gray Nissan Altima with Illinois license plate Y939455 (Nissan Altima) pulled next to the CS. The CS entered the Nissan Altima to conduct the deal. In the back passenger was a subject, later identified as ROBINSON. ROBINSON handed the CS the suspected fentanyl and the CS handed ROBINSON $50. The CS and ROBINSON then left the area.

33.     Following the controlled buy, the CS met with case agents and turned over the suspected crack cocaine and fentanyl. The CS was debriefed and showed a picture of SIMMONS and ROBINSON, and the CS was able to positively identify both SIMMONS and ROBINSON. The suspected fentanyl weighed 1.7 grams and field tested positive for fentanyl. The suspected crack cocaine weighed 1.4 grams and field tested positive for cocaine. The controlled substances were sent to the DEA Crime Lab for further testing.

34.     Following the controlled buy between ROBINSON and the CS, other case agents followed the Nissan Altima to McDonalds located at 1120 Miller Parkway, West Milwaukee, Wisconsin. At the McDonalds, case agents observe ROBINSON have a short contact an

13

unidentified white male. Based on my training, experience, and investigation, I believe this short contact was consistent with a drug transaction. Following this suspected drug transaction, the Nissan Altima then left McDonalds. Case agents then lost sight of the Nissan Altima while attempting to conduct surveillance.

35.     Case agents reviewed DOT records for the Illinois license plate Y939455. The plate was registered to a 2015 Gray Volkswagen to Geneva M. OATMAN out of Chicago, IL. Illinois license plate Y939455 did not match the vehicle that was being driven during the controlled buy. As previously noted, based on my training and experience, this is a technique used by drug traffickers in an attempt to prevent law enforcement from identifying individuals engaged in criminal conduct or location associated with drug traffickers.

### d. Drug Transaction with SIMMONS and ROBINSON– Telephone number XXX-XXX-1200 and 414-XXX-XX29 – December 5, 2023

36.     On December 5, 2023, UC coordinated an undercover purchase of 1 ounce of fentanyl for $1400.00 from the DTO's telephone number 414-XXX-XX29, believed to be used by SIMMONS. 2023.

37.     On December 5, 2023, around 1:59 p.m., UC contacted telephone number XXX-XXX-1200, believed to be used by SIMMONS. During that recorded phone call SIMMONS stated that his phone was messed up (referring to telephone number XXX-XXX-1200) and for the UC to call his other line, 414-XXX-XX29. UC contacted SIMMONS at approximately 2:00 p.m. on the other telephone number 414-XXX-XX29 and arranged for the drug transaction. The last buy that the UC conducted with SIMMONS for an ounce on September 26, 2023,

14

SIMMONS gave the UC only 25 grams.[1] UC asked SIMMONS if SIMMONS was good for $1400.00 for 28 grams. Case agents could hear on the telephone SIMMONS asking another person if they were good for 28 grams for $1400.00. Based on my training, experience, and investigation into the DTO, case agents believe SIMMONS was speaking with ROBINSON, who previously provided heroin/fentanyl to the UC on behalf of SIMMONS. SIMMONS then responded to the UC, that was good. UC and SIMMONS agreed to meet at KFC on Miller Parkway in West Allis, Wisconsin. KFC is the same spot that the UC conducted a deal on September 12, 2023, with SIMMONS.

38. At 2:32 p.m., UC arrived at KFC and called SIMMONS on telephone number 414-XXX-XX29. SIMMONS directed the UC to an address of 3831 North 13th Street, Milwaukee, Wisconsin. The UC arrived at that location and parked in front of 3831 North 13th Street. UC contacted SIMMONS on telephone number 414-XXX-XX29 and told SIMMONS the UC arrived. SIMMONS stated that he was just about to pull up. At 2:58 p.m., case agents observed a Honda Accord, previously used by SIMMONS on the September 21, 2023, drug transaction. The Accord pulled next to UC's undercover vehicle. Case agents observed ROBINSON was driving the Accord and SIMMONS was the passenger. During the drug transaction, ROBINSON handed UC the suspected fentanyl and UC handed ROBINSON $1500.00. UC gave $100.00 to ROBINSON and SIMMONS as a "thank you" for doing business. UC talked to ROBINSON and SIMMONS and asked if the UC wanted to go up to 2,3,4 ounces, would the UC still call ROBINSON and SIMMONS. ROBINSON and SIMMONS responded with, yes and shaking their head in relation to their response. After the

---

[1] The detail of the September 26, 2023 controlled buy are not outlined in the affidavit.

conversation the UC then left the area. Case agents were not able to follow the Accord.

39.     Following the undercover drug transaction, UC turned over the suspected fentanyl to case agents. The substance was weighed, and field tested by case agents. The substance weighed 29.6 grams and a positive test for fentanyl. The controlled substance was sent to the DEA Crime Lab for further testing.

### e. Drug Transaction with ROBINSON – Telephone Number XXX-XXX-1200– March 6, 2024

40.     On March 6, 2024, the UC had arranged to buy a 1/2 ounce of fentanyl from phone number XXX-XXX-1200. It should be noted that case agents had information that Jaheim ROBINSON was in control of the DTO drug phones. At around 9:45am, UC placed a phone call to XXX-XXX-1200 to set up a purchase of 1/2 ounce of fentanyl. The subject that answered the phone was Jaheim ROBINSON. Case agents are familiar with ROBINSON's voice from phone calls and previous operations involving ROBINSON. ROBINSON advised the UC to call him when the UC gets closer to the city. At approximately 10:18am, the UC called ROBINSON at XXX-XXX-1200 and told ROBINSON that the UC was close. At that time, ROBINSON sent the UC to 4300 North Green Bay Avenue, Milwaukee, Wisconsin.

41.     At approximately 10:37am, the UC contacted ROBINSON via XXX-XXX-1200 and ROBINSON directed the UC to the auto shop just to the north. ROBINSON identified it as his uncle's shop. The UC pulled into the lot and backed into a parking stall. A short time later, ROBINSON stated that he was coming down Capitol Drive and would be there in 5 minutes.

42.     A short time later, the UC parked in the lot and waited for ROBINSON. At approximately 10:59am, ROBINSON arrived to conduct to the deal. ROBINSON pulled next to

16

the UC and backed in next to the UC. ROBINSON was driving the Jeep. Case agents ran the Jeep's license plates, and it came back to a rental company.

43. The Jeep backed next to the UC's vehicle, and they conducted the deal from driver's side window to passenger side window. As soon as ROBINSON pulled up, ROBINSON handed the UC the suspected fentanyl and the UC handed ROBINSON $700.00 of DEA funds.

44. Case agents attempted to follow ROBINSON after the deal. ROBINSON pulled to the south side of the parking lot and then exited southbound on North Green Bay Avenue. ROBINSON took a right turn onto North 9th Street and pulled over in front of 3751 North 9th Street. Case agents did not see ROBINSON get out. Eventually ROBINSON pulled off and case agents lost sight of the Jeep. Case agents believe that ROBINSON pulled over in an attempt to see if anyone was following him.

45. Case agents met with the UC and the UC turned over the suspected fentanyl. Case agents weighed and conducted a field test on the suspected fentanyl which tested positive for the presence of fentanyl and weighed 15.3 grams. The suspected fentanyl was processed and mailed to the North Central Laboratory for further testing.

46. The UC advised that ROBINSON was the only person in the Jeep during the deal.

**f. Drug Transaction with ROBINSON – Telephone Number 414-XXX-XX29 – April 9, 2024**

47. On April 9, 2024, the UC had arranged to buy 40 grams of fentanyl from phone number 414-XXX-XX29.  It should be noted that case agents had information that Jaheim ROBINSON was in control of the DTO drug phones. At around 1:30pm, UC placed a phone call to 414-XXX-XX29 to set up a purchase of 40 grams of fentanyl. The subject that answered the

17

phone was Jaheim ROBINSON. Case agents are familiar with ROBINSON's voice from phone calls and previous operations involving ROBINSON. ROBINSON advised the UC to go to the auto shop at 4300 North Green Bay Avenue. Case agents set up in the area of the shop and waited for ROBINSON to arrive.

48.     At approximately 3:05pm, ROBINSON arrived to conduct to the deal. ROBINSON pulled in the lot as a passenger of a silver van with Wisconsin license plate 24115AFT (Van). Case agents ran the license plates, and the Van came back to a rental company.

49.     The UC walked over to the Van and got in the back of the Van. UC handed ROBINSON the $2400.00 of ATF funds and ROBINSON handed the UC the suspected fentanyl. Case agents learned that ROBINSON was the front passenger of the Van, and another male was the driver. The UC the left the area after the deal.

50.     Case agents attempted to follow ROBINSON after the deal. ROBINSON went north on North Green Bay Avenue. Case agents estimated the Van to be doing well over the speed limit and lost sight of the Van. Surveillance was then terminated after losing the Van.

51.     Case agents met with the UC and obtained the suspected fentanyl. Case agents weighed and conducted a field test on the suspected fentanyl which tested positive for the presence of fentanyl and weighed 40.9 grams. The suspected fentanyl was processed and mailed to the North Central Laboratory for further testing.

52.     ROBINSON was arrested on April 10, 2024, in the Van. After the arrest of ROBINSON, the phone number XXX-XXX-1200, stopped receiving location information as the phone shut off. On April 13, 2024, case agents received information from AT&T that the phone

18

number XXX-XXX-1200's IMSI number had changed and that in the afternoon of April 13, 2024, case agents began getting location information again for XXX-XXX-1200. This is consistent with XXX-XXX-1200 being ported to a new device. ROBINSON was released from custody and posted $15,000 cash bail on April 16, 2024.

53.　　On April 29, 2024, the UC called telephone number XXX-XXX-1200 and spoke to ROBINSON regarding future business and ROBINSON told the UC that he is good.

**g. Drug Transaction with ROBINSON – Telephone Number XXX-XXX-1200– April 29, 2024**

54.　　On April 29, 2024, the UC had set up a controlled buy for 50 grams of fentanyl from phone number XXX-XXX-1200. It should be noted that case agents had information that ROBINSON was in control of the DTO drug phones. At around 11:38am, the UC placed a phone call to XXX-XXX-1200 to set up a purchase of 50 grams of fentanyl. The subject who answered the phone was Jaheim ROBINSON. Case agents are familiar with ROBINSON's voice from phone calls and previous operations that ROBINSON has been on. ROBINSON advised the UC to go to the shop like last time. Case agents are familiar with this shop as the last deal on April 9, 2024 was at 4320 North Green Bay Avenue, Milwaukee, Wisconsin with ROBINSON. Shortly after case agents and the UC were leaving the staging location, ROBINSON called the UC to go to 26th and Michigan.

55.　　At approximately 12:18pm, the UC placed a call to ROBINSON on phone number XXX-XXX-1200. ROBINSON answered and told the UC to go to 2621 West Michigan. The UC parked in front of the address and waited for ROBINSON.

56.　　At approximately 12:25pm, ROBINSON showed up to the deal. ROBINSON

19

was driving a Ford F-250 greyish/brown in color (Ford) and told the UC to pull in the back parking lot of the address. ROBINSON was with another unknown black male, who went into the residence (2621 West Michigan) to retrieve the fentanyl. The UC and ROBINSON had a conversation as ROBINSON was supposed to sell the UC a Glock 10mm with a "switch" but did not bring that to the deal. Based on my training and experience, a machine-gun conversation device, also known as a "switch", causes a semi-automatic firearm to become fully automatic firearm, meaning one pull of the firearm trigger would result in multiple rounds of ammunition being fired. The UC conducted the deal with ROBINSON in the back of the Ford. Once the deal was done, the UC left the area. At approximately 1:00pm, ROBINSON was seen leaving the area. Case agents attempted to follow ROBINSON, but due to his driving behavior, case agents terminated the surveillance of ROBINSON.

57. After the UC left the area of the deal, the UC met with case agents were the UC turned over the suspected fentanyl. Case agents weighed and conducted a field test on the suspected fentanyl which tested positive for the presence of fentanyl and weighed 55.6 grams and was processed and mailed to the North Central Laboratory for further testing and safekeeping.

58. On April 29, 2024, at around 4:30pm, ROBINSON called the UC and advised the UC that ROBINSON had the gun and was ready. The UC stated he was busy and couldn't meet up. Case agents believed that ROBINSON and the UC would have future contact concerning this firearms purchase.

### h. Firearm Transaction with ROBINSON – Telephone Number XXX-XXX-1200– May 2, 2024

20

59.     On May 2, 2024, the UC had set up a buy/walk for the Glock 10mm with a switch by speaking with ROBINSION on phone number XXX-XXX-1200.  It should be noted that case agents had information that ROBINSON was in control of the DTO dope phones.

60.     At approximately, 9:50am, the UC contacted XXX-XXX-1200, and a subject other than ROBINSON answered the phone.  This person identified themselves as "J" and stated he was the guy that ROBINSON was with at the last deal.  "J" stated that ROBINSON knew that the UC was coming to Milwaukee for the deal.  At this time "J" gave the UC phone number 414-XXX-XX70 to contact ROBINSON.  Case agents were familiar with phone number 414-XXX-XX70 as ROBINSON'S number as recently as April 19, 2024.  On that date, a garbage pull was done at ROBINSON's house, 5665 North 72nd Street, Milwaukee, Wisconsin, and there was a cell phone box with the phone number identified on it as 414-XXX-XX70.  The box was listed to Kaliyah SMITH.  Case agents believe that SMITH is ROBINSON's girlfriend based on a review of social media, the contents of relevant trash searches, and information provided in a prior police report involving SMITH wherein she identified ROBINSON as her boyfriend.

61.     At approximately 10:26am, ROBINSON called the UC from phone number 414-XXX-XX70 and advised the UC to go to 56th and Silver Spring.

62.     At approximately 10:46am, case agents observed ROBINSON in the area of 64th and Silver Spring heading east.  At that time, he was driving the Ford, with license plates PZ3725,  that was used in the last deal on April 29, 2024, driving east bound on Silver Spring.

63.     At approximately 10:50am, the UC advised ROBINSON to go to 60th and Silver Spring.  ROBINSON at this time agreed.  At approximately 10:54am, case agents observed ROBINSON at 60th Street and Hampton at the AutoZone parking lot.  At approximately

21

10:56am, ROBINSON called the UC and advised him to go to 66th Street and Silver Spring. It should be noted that ROBINSON's address is 5665 North 72nd Street, Milwaukee, Wisconsin, which is just to the west of this intersection off of Silver Spring. Case agents determined that this was an address associated with ROBINSON based upon the contents of at least one garbage search.

64. At approximately 10:58am, the UC parked his car in the area of 66th Street just north of Silver Spring and waited for ROBINSON. ROBINSON showed up shortly after the UC parked. ROBINSON got into the UC's vehicle. The UC and ROBINSON talked about the gun. The UC handed ROBINSON $2300.00 of ATF funds and ROBINSON handed the UC the firearm with a switch on it. The UC confirmed that this gun does have a switch on it and is a 10mm Glock.

65. During the conversation of the deal, ROBINSON stated that his cousin is down in Indianapolis right now and is picking up more switches. The UC asked ROBINSON if ROBINSON's brother can get more of these, implying the gun and switch, and ROBINSON replied with, "yes." The UC then left the area after the deal. Surveillance did not follow ROBINSON and surveillance was terminated.

66. The UC showed case agents the firearm and the UC confirmed it was a 10mm Glock, bearing serial number NZG639, with a switch. The UC advised case agents that the switch is a good quality switch as the switch does toggle from semi-automatic to full automatic. Case agents ran the serial number, NZG639, and learned that it was not reported stolen. The Glock also has a distinct light/laser light. It should be noted that there is a post on ROBINSON's Facebook page from September 16, 2023, with a picture of what appears to be the same gun that

22

the UC purchased from ROBINSON shown in the post. The UC is trained and experienced in evaluating firearms and test fired the 10mm Glock with the machinegun conversion device obtained from ROBINSON and confirmed that the device allowed the weapon to fire in a fully automatic manner.

67.     Case agents searched public social media for members of the DTO. Case agents located a Facebook page for Jaheim ROBINSON. The Facebook page has the name Heim Loww and the address bar for the page is Jaheimj.robinson. Case agents reviewed the public Facebook page and observed a post on September 16, 2023, four days after the undercover controlled buy in which ROBINSON was present. The September 16, 2023, post had multiple pictures of ROBINSON and with a lot of money and what appeared to be a handle of a firearm in his waist band (Figure 1). There were also photos of ROBINSON with SIMMONS (Figure 2). In this photo ROBINSON and SIMMONS were wearing a black sweatshirt with "BBM" on the front, which case agents believes refers to Brothers Before Millions, displaying a large amount of cash, and ROBINSON still had what appeared to be a handle of a firearm in his waistband. (Figure 2).

 

(Figure 1)                              (Figure 2)

68.     During the September 16, 2023 posts, there was another picture where a firearm, that appeared to have a machine-gun conversation device attached, was laying on money and it appeared SIMMONS and ROBINSON were standing above it, based on the shoes from the other photos (Figure 3).   This appears to be the same firearm/switch purchased by the UC on May 2, 2024, as it is a rare kind of weapon and the appearance (including the light accessory) is consistent with the firearm provided by ROBINSON.



(Figure 3)

**i.  Machinegun and Drug Transaction with ROBINSON – Telephone Number**

24

**414-XXX-XX70– May 24, 2024**

69.     On May 17, 2024, at approximately 10:29 A.M., the UC received an incoming telephone call from telephone number XXX-XXX-8400, which is a telephone number investigators had previously identified as a number utilized by ROBINSON based on call detail records and ROBINSON later providing this number to the UC. Upon answering ROBINSON's call, the UC feigned ignorance and asked who was calling the UC from telephone number XXX-XXX-8400. Although the UC and other investigators had known ROBINSON utilized the aforementioned telephone number, ROBINSON had not previously communicated with the UC from said telephone number; therefore, the UC would not have known about the existence of said telephone number. Upon the call being connected, ROBINSON greeted the UC and offered to sell two machinegun conversion devices to the UC. The UC stated they were currently out of town but would purchase the two machinegun conversion devices from ROBINSON once the UC had returned to the Milwaukee area the following week. ROBINSON then stated, "The other [telephone] numbers, it's a female  who got those phones [now], so I don't know if you wanna deal with her or not, but ... " In response, the UC asked ROBINSON, "Are you cool with her or are you saying you ain't got those numbers [permanently]?" To which ROBINSON replied, "I don't got those [other] numbers until we can get them back."  In this context, the UC understood ROBINSON'S statements to mean the DTO "drug lines" had been involuntarily taken from ROBINSON.  The UC asked ROBINSON who he prefer the UC to contact if the UC wanted to purchase fentanyl. ROBINSON stated, "Call me .. she don't have what I have." In this context, the UC understood ROBINSON'S statement to mean ROBINSON believed his supply of fentanyl was of higher quality.

25

70.     On May 24, 2024, the UC had set up controlled buy of 25 grams of fentanyl and two machinegun conversion devices by speaking with ROBINSION on phone number 414-XXX-XX70. It should be noted that case agents had information that ROBINSON was in control of some of the DTO dope phones, to include 414-XXX-XX70 while another female was in control of XXX-XXX-1200.

71.     The UC contacted 414-XXX-XX70, and ROBINSON answered the phone. ROBINSON told the UC to go to the spot, meaning the shop at 4320 North Green Bay Avenue. Surveillance officers observed a black Jetta with no license plates arrive at ROBINSON's house at 5665 North 72nd Street, Milwaukee, Wisconsin. The driver of the Jetta was another male. ROBINSON entered a Nissan Altima with dealer plate 16416AFT (Altima). Once the UC was at the meet location, the UC contacted ROBINSON and ROBINSON advised that he would be there shortly. The other male and ROBINSON arrived back at ROBINSON's residence on North 72nd Street. ROBINSON went inside 5665 North 72nd Street, Milwaukee, Wisconsin for less than a minute and then returned to the Altima where the male driver was waiting. The UC spoke with ROBINSON who advised he was five minutes away. A short time later, ROBINSON arrived at the auto shop in the Altima. The UC got into the back of the Altima and provided ROBINSON with the money for the drugs and switches.

72.     After entering the Altima, the UC observed numerous Apple iPhones between ROBINSON and the driver and a clear plastic bag containing approximately three (3) ounces of a brown/tan chunky substance (suspected fentanyl) being held by ROBINSON. ROBINSON and the driver greeted the UC before ROBINSON informed the UC that he (ROBINSON) would prepare a bag of 25 grams of fentanyl for the UC. ROBINSON then utilized a digital scale,

26

which had been placed on the center console, and transferred approximately 25 grams of suspected fentanyl into a separate knotted-off clear plastic bag, which ROBINSON subsequently provided to the UC. The UC asked ROBINSON if the switches he brought with him were "the same ones" ROBINSON'S cousin had "gone down to Indy (Indianapolis) to get." ROBINSON replied, "mmhmm." The driver, referencing the machinegun conversion devices ROBINSON had transferred to the UC, stated, "Them the metal dudes, them ain't gonna melt .. Them gonna make 'em (Glock pistols) spray (fully automatic)." The driver and ROBINSON then both complimented the quality of silver-machinegun conversion devices, specifically. Referencing the silver-colored machinegun conversion devices, The driver stated, "It sounds like a laser too, that silver one. *The driver imitates machine gun sound*. It sounds like a laser. *The driver again imitates machine gun sound*." Additionally, after receiving the machinegun conversion devices, The driver instructed the UC to take great caution in where the UC stored/concealed the machinegun conversion devices in the event the UC was stopped by law enforcement. In the context of the conversation, the UC understood the Driver was aware that the simple possession of the machinegun conversion devices was a serious criminal violation/a felonious act.

73.     ROBINSON received a call from a suspected fentanyl customer on one of the multiple Apple iPhones between ROBINSON and the driver. After approximately one minute, the UC provided ROBINSON with $2,500 in buy money ($1,000 for the two (2) machinegun conversion devices and $1,500 for the 25 grams of purported fentanyl) and invited the driver to come with the UC to see the hidden compartment where the UC frequently stored contraband (i.e., firearms and narcotics). The UC walked to the driver seat of the undercover vehicle and directed the driver to the front passenger door. The driver opened the front passenger door and

the UC opened the hidden compartment so that the driver could observe how the compartment was operated. The UC then handed driver the machinegun conversion devices and the suspected fentanyl and asked driver to place the items inside the compartment, which the driver subsequently did.

74.     After the UC left the area of the deal, the UC met with case agents and turned over the suspected fentanyl and showed the two machinegun conversion devices. Case agents weighed and conducted a field test on the suspected fentanyl which tested positive for the presence of fentanyl and weighed 25.8 grams.

**CONCLUSION**

75.     Based on the above information and facts, I submit that there is probable cause to believe that Jaheim Robinson has violated the laws of the United States including of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), and 843(b) (Use of Communications Facilities to Facilitate Controlled Substance Felonies) and Title 18, United States Code, Sections 922(o) (Possession of a Machinegun)  and 2(a) (Aiding and Abetting the Aforementioned Offenses), which occurred in the Eastern District of Wisconsin.